UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:19-CV-62216-SINGHAL

JANET MARTIN,

    Plaintiff,

v.

INTERNATIONAL FREIGHT CONSOLIDATORS, INC.,

    Defendant.
_____/

# **D**EFENDANT'S **S**TATEMENT OF **F**ACTS **S**UPPORTING **I**TS **M**OTION FOR **S**UMMARY **J**UDGMENT

**About International Freight Consolidators, Inc.**

1. International Freight Consolidators, Inc. ("IFC"), is a freight consolidation company in South Florida that exports merchandise to Jamaica. (Depo. Collins; p. 8: 6-19.)

2. IFC has four locations. (*Id.*, p. 10: 1-16.)

3. IFC's main location is in Miami. (*Id.*, p. 10: 20-22.)

4. Its other locations are in West Palm Beach, Lauderdale Lakes, and Miramar. (*Id.*, p. 11: 2-5.)

5. IFC usually employs three warehouse personnel, four regular staff, and then during its busy season an additional four seasonal employees at the Lauderdale Lakes location. (*Id.*, pp. 11-12: 19-2.)

6. Michael Wright worked as a manager for IFC, and he was responsible for managing the Lauderdale Lakes location. (*Id.*, p. 19: 19-21.)

**IFC's Seasonal Workforce Needs**

7. IFC has a busy season that normally lasts from about September to early December of each year. (Depo. Wright, p. 10: 13-21.)

8. IFC employs seasonal employees and year-round employees, and the difference is that the year-round employees have their work hours reduced at the end of the busy season, while the seasonal employees are terminated at the end of the busy season. (Depo. Wright, p. 14: 1-17; Depo. Collins, p. 13-19.)

9. Due to the length of time needed for shipments to be processed, loaded, transported by vessel to Jamaica, and then processed through customs in Jamaica, IFC customarily reduces its workforce during the second or third week of December each year. (Depo. Wright, pp. 10-12: 22-6.)

10. IFC reduces its workforce to correspond with the decreased staffing needs by reducing the hours of its more senior, permanent office/administrative employees, and by terminating the employment of its seasonal, office/administrative workforce. (Depo. Collins, p. 32: 5-21; p. 55-56: 10-1.)

11. IFC does not need as many employees when the business is slow because there is less need for staff. (Depo. Wright, p. 13: 1-10).

12. In December 2018, IFC reduced the hours to be worked by three other office/administrative personnel in the Lauderdale Lakes office: Kevin Wedderburn, Paulette Ximines Wiley, and Andrea Archer. (Depo. Wright, p. 17: 2-14; and ECF No. 59-1 at ¶¶15-16.)

13. Ms. Martin requested time off to attend a doctor's appointment, and IFC accommodated her. *Id.*, at ¶17.

14. Then, IFC held a staff meeting at which it informed its employees that there would be layoffs on December 21, 2019, due to the decrease in shipping demand. *Id.*, at ¶19.

15. IFC terminated the employment of Jennifer Flores, Danielle Thompson, and Marjorie Escoffery on December 21, 2018, but did not terminate Ms. Martin's employment on that day. (*Id.*, at ¶20; Depo. Wright, p. 16: 2-7.)

16. IFC made the decision to terminate Ms. Martin's employment as of January 4, 2019, which corresponded with the end of the (next) pay period. *Id.*, at ¶22.

17. IFC ultimately terminated Ms. Martin's employment on January 4, 2019, which was the last day of the subsequent pay period. (Depo. Collins, p. 30: 3-5; Exhibit "A" at BATES003377.)

18. IFC typically hires "casual laborers" to perform warehouse cleanup after the busy shipping season. (Depo. Collins, p. 32: 5-21.)

## Work History of Janet Martin

19.     IFC hired Janet Martin to work as a seasonal customer service agent during IFC's busy shipping season. (Depo. Collins, p. 20: 17-22.)

20.     Ms. Martin began working for IFC on October 16, 2017, and then stopped working for IFC on December 28, 2017. (Exhibit "B" at BATES00007-BATES00012.)

21.     Notably, Ms. Martin worked only 54 hours from December 2, 2017, through December 14, 2018, and then worked only 64.41 hours from December 16, 2017, through December 17, 2018, when her seasonal employment ended. (Exhibit "B" at BATES000011-BATES000012.)

22.     Ms. Martin resumed working for IFC on January 27, 2018, on a part-time basis, working approximately 20 hours per week, through May 31, 2018. (Exhibit "B" at BATES000013-BATES000021.)

23.     After several months, Ms. Martin returned to work at IFC for its busy season starting in late August 2018 until January 4, 2019. (Exhibit "A" at BATES0003368-BATES003378.)

24.     Ms. Martin's hours were reduced starting in December 2018 from 80 hours every two weeks to just under 71 hours every two weeks for the pay period from December 15-28, 2018, and she then worked a total of 24.61 hours the following (her last) pay period. (Exhibit "A" at BATES0003377- BATES003378.)

25.     In the meantime, Ms. Martin requested by text message to Mr. Collins, time off so that she could "have treatment" on January 3, 2019:

> Jan 3, 2019, 12:08 PM
>
> Good morning Sir. I have treatment today so i am off on the schedule

(Exhibit "C".)

26. Ms. Martin did not work on January 3, 2019. *Id.*

27. Ms. Martin's employment with IFC ended on January 4, 2019. (Depo. Collins, p. 30: 3-5.)

28. Mr. Wright is the one who told Ms. Martin that her employment ended and explained to her the reason was due to her being a "seasonal employee" and due to the "seasonal downturn in business". (Depo. Wright, pp. 18-19: 16-13.)

29. Even though Mr. Wright informed Ms. Martin that her seasonal employment ended when she arrived at work at IFC on January 4, 2019, and although Ms. Martin did not work that day, IFC still paid her for the day as if she had worked. (Depo. Wright, p. 19: 5-19.)

**Ms. Martin Knew What She Was Doing After Her Employment Ended**

30. Promptly after being fired, Ms. Martin sent in her Charge of Discrimination to the EEOC on January 14, 2019, through her counsel. (Exhibit "D".)

31. Four days later, on January 18, 2019, Ms. Martin applied for Social Security Disability Benefits over the phone and attested that she, "became unable to work because of [her] disabling condition on January 4, 2019."

> I BECAME UNABLE TO WORK BECAUSE OF MY DISABLING CONDITION ON January 4, 2019.
> I AM STILL DISABLED.

\*\*        \*\*        \*\*

```
I WAS DIAGNOSED WITH MY CONDITION IN 11/2018, BUT WAS ABLE TO CONTINUE
WORKING. I STOPPED WORKING IN 01/2019 DUE TO MY CONDITION.

I KNOW THAT ANYONE WHO MAKES OR CAUSES TO BE MADE A FALSE STATEMENT OR
REPRESENTATION OF MATERIAL FACT IN AN APPLICATION OR FOR USE IN DETERMINING A
RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER
FEDERAL LAW BY FINE, IMPRISONMENT OR BOTH. I AFFIRM THAT ALL INFORMATION I HAVE
GIVEN IN CONNECTION WITH THIS CLAIM IS TRUE.
```

[ECF No. 59-2 at 2-3.][1]

32. Ms. Martin also applied for Social Security Supplemental Insurance Benefits on January 22, 2019, wherein she again attested that her "disability began on January 4, 2019." [ECF No. 59-2 at 4.]

33. Ms. Martin also knew that she had the opportunity to correct any misstatements in the transcripts of her applications for Social Security benefits.

```
What You Need To Do
    o   Review this summary to ensure we recorded your statements correctly.
    o   If you agree with all your statements, you should keep this summary for
        your records.
    o   If you disagree with any of your statements, you should contact us within
        10 days after receiving this summary to let us know.
```

[ECF No. 59-2 at 4.]

34. Ms. Martin was approved to receive Social Security Disability as of July 2019. [ECF No. 59-2 at 10.]

35. Plaintiff cannot argue that Ms. Martin was unaware of her ability to modify or correct her statements to the Social Security Administration, or that she was unaware of the contents of those applications, considering that Ms. Martin requested a review of her Supplemental Security Income decision. [ECF No. 62-2.]

---

[1] *See* https://blog.ssa.gov/prepare-for-your-disability-interview-tips-from-social-security/ ("You can apply for benefits on our website; it's the most convenient way. Additionally, you can contact us at 1-800-772-1213 (TTY 1-800-325-0778) or visit your local office if you wish to apply for disability benefits.")

## Procedural History

36. Ms. Martin filed the Complaint in this case on September 5, 2019, through the same counsel who filed her Charge of Discrimination with the EEOC. [ECF No. 1.]

37. IFC filed its Answer and Affirmative Defenses on October 4, 2019. [ECF No. 8.]

38. After exchanging written discovery and after IFC obtain records from non-parties, Ms. Martin refused to appear for deposition, resulting in the Court entering an Order requiring that she appear for deposition. [ECF Nos. 35, 40.]

39. Ms. Martin died on May 19, 2021, without giving a deposition in this case. [ECF Nos. 44, 52-1.]

40. Jennifer Gobern petitioned the Probate Court in Broward Count to open an Estate for Ms. Martin on November 29, 2021, identifying the potential settlement proceeds of this case (of $100,000) as the only assets of Ms. Martin's estate. (Exhibit "E" at ¶7.)

41. Plaintiff requested and received the Court's permission to substitute Jennifer Gobern as the Personal Representative of the Estate of Janet Martin as the Plaintiff in this case. [ECF No. 52.]

## IFC Did Not Discriminate Against Ms. Martin

42. Mr. Collins did not know that Ms. Martin had cancer or was being treated for cancer at any time before he decided to terminate her employment on January 4, 2019. (Depo. Collins, p. 56: 2-19.)

43. Mr. Collins did not know the type of treatment that Ms. Martin was receiving on January 3, 2019, and he had no idea that she was undergoing chemotherapy on that day. (Depo. Collins, p. 50: 21-17.)

44. Mr. Collins made the decision to terminate Ms. Martin's employment. (Depo. Collins, p. 56: 17-18.)

45. The decision to terminate Ms. Martin's employment had absolutely nothing to do with whether she had cancer" or "with whether she was undergoing treatment for cancer". (Depo. Collins, p. 56-57: 20-7.)

46. IFC did not discriminate against Ms. Martin because of her disability. [ECF No. 59-1 at ¶¶47-51.]

47. Ms. Martin never told Mr. Wright about any illness that she had during her employment. (Depo. Wright, pp. 27-28: 24-2.)

48. Mr. Wright never talked about Ms. Martin's health or health conditions with other employees at any meeting. (*Id.*, at p. 28: 3-7.)

49. Mr. Wright did not discuss any concerns he had about Ms. Martin's health with Mr. Collins. (*Id.*, at p. 28: 8-11.)

50. While she worked for IFC, Mr. Wright did not learn what medical condition Ms. Martin had. (*Id.*, at pp. 28-29: 21-1; 66: 18-23.)

51. Ms. Martin never told Mr. Wright about any medical from which she suffered, about any disability, or about any limitations in the work that she could perform. (*Id.*, at p. 31: 12-23.)

52. Mr. Wright did not reduce Ms. Martin's hours because of any illness that she had. (*Id.*, at p. 32: 3-7.)

53. Mr. Wright did not discriminate against Ms. Martin. (*Id.*, at p. 32: 10-13.)

54. Mr. Wright did not believe that IFC discriminated against Ms. Martin. (*Id.*, at p. 32: 14-20.)

55. IFC did not terminate Ms. Martin's employment for any reason related to any illness from which she suffered or any disability. (*Id.*, at pp. 32-33: 21-12.)

56. Mr. Wright never told Mr. Collins that he or IFC could not keep Ms. Martin employed because of her health. (*Id.*, at p. 71: 4-12.)

57. Mr. Wright never told Mr. Collins or anyone else at IFC that he was afraid that Ms. Martin would fall down when she was with a customer. (*Id.*, at p.71-72: 18-6.)

**CERTIFICATE OF SERVICE**

Dated this 8th day of July 2022.

s/Brian H. Pollock, Esq.
Brian H. Pollock, Esq.
Fla. Bar No. 174742
brian@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue
Suite 770
Coral Gables, FL 33146
Tel:    305.230.4884
*Counsel for Defendant*